In the
United States Court of Appeals
For the Seventh Circuit

Nos. 98-1955, 98-2584

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DONALD V. CASHMAN, and
SCOTT D. FEDDERLY,

Defendants-Appellants.

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 97 CR 102--John C. Shabaz, Chief Judge.

Argued September 14, 1999--Decided June 9, 2000

Before BAUER, ROVNER, and EVANS, Circuit Judges.

ROVNER, Circuit Judge.  Donald Cashman and Scott
Fedderly pleaded guilty to conspiring to
distribute methamphetamine, in violation of 21
U.S.C. sec. 846. Cashman contests the legality of
a traffic stop that culminated in the search of
his automobile and the discovery of evidence
pointing to his involvement in the conspiracy.
Fedderly contests the district court's finding
that he possessed a firearm in the course of the
conspiracy, see U.S.S.G. sec. 2D1.1(b)(1),
asserting, inter alia, that the district court
improperly relied on information which, according
to the terms of his plea agreement, could not be
used against him. We affirm.

I.

   On August 17, 1997, Cashman was driving his
Chevy Blazer on Interstate Highway 94 through St.
Croix County, Wisconsin, when Wisconsin State
Trooper Jason Spetz pulled him over. Trooper
Spetz effectuated the stop when he noticed a
crack in the windshield of Cashman's Blazer. In
the course of issuing a warning ticket to
Cashman, Spetz asked for and received Cashman's
permission to search the interior of the Blazer.
Inside, the trooper discovered, among other
things, methamphetamine and a spiral index-card
notebook containing drug-related entries.

After he was indicted, Cashman moved unsuccessfully to suppress the evidence that Trooper Spetz seized from his vehicle. Cashman argued that the traffic stop that led to the search was unlawful. However, acting on the recommendation of the magistrate judge, the district court concluded that the stop was justified by the crack in the Blazer's windshield. Wisconsin law requires that a vehicle's windshield not be "excessively cracked or damaged." See Wis. Admin. Code sec. Trans. 305.34(3) (1997). A photograph of the Blazer's windshield indicated that the crack was from seven to ten inches long, extending two inches above the left windshield wiper of the car in its resting position. Gov. Exs. 1, 1-A; see R. 52 at 2-3; R. 56 at 2. In the court's view, this appeared to be an "excessive" crack, supplying Spetz with probable cause to stop Cashman's vehicle. R. 52 at 2-3; R. 56 at 2. The motion to suppress was therefore denied, and Cashman pleaded guilty a short while later.

An anonymous tip led the authorities to Fedderly, a distributor of methamphetamine whom Cashman supplied. The tipster apprised the Dunn County, Wisconsin Sheriff's Department by telephone on August 12, 1997, that Fedderly, who was wanted on several outstanding warrants, was staying in a stolen motor home parked in rural Menominee. After looking the home over and confirming that it had been reported stolen, officers performed an inventory search. Inside a cupboard at the foot of a bed, they discovered a loaded .22 caliber revolver along with some of Fedderly's clothing. Elsewhere in the home they found a baggie containing what appeared to be marijuana, drug paraphernalia, a wallet with a social security card issued to Fedderly, and just under $500 in cash. Fedderly was arrested the following day. When asked about the gun, he admitted that it belonged to him and (unlike the motor home) was not stolen. R. 112 at 12, 21-22; see also R. 100 para. 14. On August 14, the home was searched again. That search produced, among other things, a black nylon tote bag, a digital scale, syringes, and baggies, as well as a gram scale and a Tupperware container, both of which had methamphetamine residue on them.

Ultimately, Fedderly pleaded guilty to conspiring along with Cashman to distribute methamphetamine. His plea agreement contained a provision committing him to "make a full, complete and truthful statement regarding his involvement in violations of federal criminal statutes, as well as the involvement of all other individuals known to the defendant." R. 84 sec. 2. That same provision, however, specified that

"the information provided by the defendant under the terms of this plea agreement will not be used against him to determine the applicable sentencing guideline range except as otherwise indicated in U.S.S.G. sec.1B1.8(b)." Id.; see also R. 111 at 8-9.

When the probation officer interviewed him prior to sentencing, Fedderly told the officer that Cashman had given him the motor home in which the gun was found because Fedderly had no place to live. According to Fedderly, Cashman said that his friends had stolen the motor home and that the handgun was in the home "at the time."/1 Fedderly said that he had never even taken the gun from the home, let alone used or carried it. The probation officer included this information in the pre-sentence report. R. 100 para.para. 40, 50.

The Sentencing Guidelines call for a two-level increase in the defendant's base offense level when the defendant possessed a dangerous weapon in the course of a drug-related offense, so long as it is not "clearly improbable" that the gun was connected to the offense. U.S.S.G. sec. 2D1.1(b)(1) & comment. (n.3). The probation officer applied that enhancement in calculating Fedderly's offense level. R. 100 para. 50. Although "[t]here is no evidence to suggest Fedderly used or carried the gun during any drug transaction," the officer reasoned, "since the weapon was provided to him by his drug supplier and was found with other indicia of drug distribution, we cannot say it is clearly improbable that the weapon was connected with the offense." Id. Fedderly contested the propriety of the enhancement, R. 112 at 18-20, but he did not argue that consideration of his statement to the probation officer as to the source of the gun violated his plea agreement with the government.

At sentencing, the district court concluded that the two-level enhancement for possession of the gun in the course of the methamphetamine conspiracy was appropriate. As the court's remarks reveal, the fact that Cashman had given Fedderly the gun figured prominently in the court's rationale.

The Court further finds that the loaded .22 caliber handgun was found in the stolen motor home in which the defendant was sometimes residing. Initially defendant informed Cragin [one of the officers who arrested him] the gun was his and not stolen; has since informed [the] probation officer that gun was in the motor home when the vehicle was provided to him by Donald Cashman. The Court notes that there is no evidence to suggest that Fedderly used or carried

the gun during any drug transaction. However, this weapon was provided to him by his drug supplier and was found with other indicia of drug distribution.

The Court notes that the adjustment should be applied if the weapon was present. Now the weapon was present in a mobile home . . . which the defendant sometimes used. It was in the vicinity, the immediate vicinity of methamphetamine residue and drug paraphernalia. That is[,] items which were normally assimilated with and/or relating to the distribution of methamphetamine. The Court cannot find that it is clearly improbable that the weapon was connected with the offense.

Those are the elements. That is the determination. The Court believes that there is a reason for this enhancement that has been suggested in numerous other cases and notes relating to the enhancement for weapon possession. It does, as indicated, reflect the increased danger of violence when drug traffickers possess weapons. We have a drug trafficker. We have . . . Donald Cashman, a drug trafficker, who provided him, [Fedderly] now tells us in his latest version, the gun. It certainly wasn't given to him to hunt squirrel. It certainly wasn't given him as a plaything.

He is in a dangerous livelihood. Perhaps [he] doesn't as yet realize how dangerous it was, but the fact is this was provided to him by a drug supplier, it was found with the other evidence and indicia of drug distribution, and the Court believes that the weapon was connected with this offense having previously advised that it cannot say it is clearly improbable the weapon was connected. It is in words of the vernacular to protect the stash and to protect the distribution thereof and to protect the cash surrounding it and to protect the defendant when he was in the mobile home in those surroundings.

R. 112 at 22-23. (emphasis ours). Again, Fedderly raised no objection as to the propriety of taking into consideration Fedderly's statement to the probation officer about the source of the gun.

The district court sentenced Cashman to a prison term of 180 months and Fedderly to a term of 144 months. Cashman now appeals his conviction, contending that the district court should have suppressed the evidence seized from his Blazer. Fedderly challenges his sentence, arguing that the government failed to establish that he possessed the revolver discovered in the mobile home during the conspiracy to distribute the methamphetamine, that it is clearly improbable that the gun had any connection to the

conspiracy, and that the district court erred in considering his statement that Cashman had given him that gun.

II.

A.

Cashman contends that the district court erred in concluding that Trooper Spetz had probable cause to effectuate the traffic stop that culminated in the search of his Blazer. We of course review the court's probable cause determination de novo, deferring to any subsidiary findings of historical fact that are not clearly erroneous. Ornelas v. United States, 517 U.S. 690, 699, 116 S. Ct. 1657, 1663 (1996); United States v. Richardson, 208 F.3d 626, 629 (7th Cir. 2000). The particular legal rule pertinent to this case is straightforward: so long as the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense, the officer has probable cause to stop the driver. Whren v. United States, 517 U.S. 806, 116 S. Ct. 1769 (1996).

The "Standards for Vehicle Equipment" set forth in the Wisconsin Administrative Code specify that the windshield of an automobile "may not be excessively cracked or damaged." Wis. Admin. Code sec. Trans. 305.34(3). Excessive cracking or damage is defined, inter alia, as "a crack inside, or which extends inside, the windshield critical area" or "cracks which extend into any area more than 8 inches from the frame." Id. sec. Trans. 305.34(3)(a) and (b). The "windshield critical area" is in turn defined as "that portion of a motor vehicle windshield normally used by the driver for necessary observations to the front of the vehicle[,] . . . includ[ing] the areas normally swept by a factory installed windshield wiper system." Id. sec. Trans. 305.05(43).

The windshield of Cashman's Blazer in fact was cracked, and the parties stipulated that Trooper Spetz "saw a cracked windshield." R. 57 at 7; see also id. at 25. But Cashman argues that the crack was not "excessive" as the Wisconsin Administrative Code defines that term--in other words, the crack neither extended more than eight inches away from the frame of the windshield nor extended into the area of the windshield swept by the vehicle's windshield wipers.

The focus of Cashman's argument is, however, misplaced. For purposes of the probable cause analysis, we are not concerned with the precise length or position of the crack. The propriety of

the traffic stop does not depend, in other words, on whether Cashman was actually guilty of committing a traffic offense by driving a vehicle with an excessively cracked windshield. The pertinent question instead is whether it was reasonable for Trooper Spetz to believe that the windshield was cracked to an impermissible degree. United States v. Smith, 80 F.3d 215, 219 (7th Cir. 1996).

The photographs in the record make plain that the crack in the Blazer's windshield was substantial. Gov. Exs. 1, 1-A. As the magistrate judge noted, and as Cashman concedes, the crack was between seven and ten inches long, and extended above the bottom of one of the resting windshield wipers. R. 52 at 2-3. A trooper in Spetz's position, then, passing or approaching Cashman's vehicle on the roadway, could readily and reasonably think that the crack met the administrative criteria for excessive cracking and that Cashman was violating the law by operating the Blazer in that condition. See Smith, 80 F.3d at 219. Careful measurement after the fact might reveal that the crack stopped just shy of the threshold for "excessive" cracking or damage; but the Fourth Amendment requires only a reasonable assessment of the facts, not a perfectly accurate one. See id. Given the evident length of the crack and its proximity to the portion of the windshield swept by the wipers, Trooper Spetz had probable cause to stop Cashman's vehicle.

B.

Guidelines section 2D1.1(b)(1) directs the court to increase the defendant's offense level by two levels if the defendant possessed a dangerous weapon while committing the offense, unless it is "clearly improbable" that the weapon had anything to do with the crime. See id. & comment. (n.3). As Judge Shabaz recognized, the enhancement accounts for the heightened risk of violence that is present when drug traffickers arm themselves. Id.; see, e.g., United States v. Cain, 155 F.3d 840, 843 (7th Cir. 1998); United States v. Burns, 128 F.3d 553, 555 (7th Cir. 1997). Individuals who do no more than conspire to distribute narcotics are nonetheless eligible for the enhancement, so long as they possess a firearm in the course of the conspiracy. See United States v. McClinton, 135 F.3d 1178, 1993 (7th Cir.), cert. denied, 524 U.S. 921, 118 S. Ct. 2308, and cert. denied, 525 U.S. 885, 119 S. Ct. 197 (1998); United States v. Wetwattana, 94 F.3d 280, 284 (7th Cir. 1996).

For three reasons, Fedderly argues, the district court erred in enhancing his offense level

pursuant to section 2D1.1(b)(1). First, the government failed to prove by a preponderance of the evidence that he possessed the revolver discovered in the mobile home during the course of the methamphetamine conspiracy; and thus the court erred in finding that he did. Second, even if he did possess the gun, it is, contrary to the district court's finding, clearly improbable that the gun was connected to the conspiracy. Finally, because the plea agreement prohibited the use of his statement about the source of the gun in calculating his sentencing range, the district court was precluded from considering that statement in assessing the propriety of the enhancement for possession of the weapon. That Fedderly possessed the firearm in the course of the conspiracy and that it was not clearly improbable the two were connected are findings of fact that we review for clear error. See United States v. Berkey, 161 F.3d 1099, 1102 (7th Cir. 1998); Burns, 128 F.3d at 556; United States v. Tyler, 125 F.3d 1119, 1122 (7th Cir. 1997). As we have noted, Fedderly raised no objection below to the district court's consideration of his statement that Cashman gave him the gun. We therefore review that issue for plain error.

The district court did not clearly err in finding that Fedderly possessed a weapon while he conspired with Cashman to distribute methamphetamine. The superseding indictment alleged that the conspiracy commenced in or about June of 1997 and extended to on or about September 22, 1997 (R. 13 at 1)--although on the record before us we have no reason to believe that there was any life left in the enterprise after Cashman and Fedderly were arrested in mid-August. The stolen motor home in which the revolver was located had been parked in Menominee for several days in August before the local authorities were alerted to its presence. Until that time, Fedderly had been in possession and control of the motor home, although the evidence suggests that he was not necessarily staying there. The loaded revolver was found within a cupboard inside the home. Given the relatively tight confines of a motor home, one could reasonably infer that Fedderly had possessed the weapon inside of it. Indeed, Fedderly admitted at the time of his arrest that the weapon was his. These circumstances lend adequate support to the district court's finding that Fedderly possessed the weapon during the course of the conspiracy.

We likewise find no error in the court's determination that it was not clearly improbable that the revolver was connected with the conspiracy. When the sheriff's deputies searched the home, they found, in addition to the loaded revolver, a variety of drug paraphernalia as well

as the gram scale and Tupperware container, both of which had methamphetamine residue on them. They also found a black nylon tote bag. According to the pre-sentence report, the pertinent findings of which were not contested, four witnesses had seen Fedderly store methamphetamine in Tupperware containers, and one witness had seen him carry these containers in a black nylon tote bag. R. 100 para.para. 30-32, 34. The record does not tell us how close these other items may have been to the cupboard in which the gun was found. But given the size of a motor home, they could not have been distant. In any case, Fedderly bore the burden of proving that it was clearly unlikely the gun was connected to his narcotics activity. United States v. Grimm, 170 F.3d 760, 767 (7th Cir. 1999). Although there is no proof that Fedderly transacted his illicit business in the motor home or that he carried the gun with him while transacting that business, for example, neither is there evidence suggesting that the presence of both the gun and the drug-related items within the motor home was coincidental. See Berkey, 161 F.3d at 1103; see generally Grimm, 170 F.3d at 767-68.

Finally, although it is undisputed that the plea agreement prohibited the district court from considering Fedderly's statement as to the source of the gun, the district court's consideration of that statement does not rise to the level of plain error. In order to establish plain error, a party must not only show that the district court erred, but that the error, left uncorrected, would result in a miscarriage of justice. E.g., United States v. Humphrey, 154 F.3d 668, 670 (7th Cir. 1998); United States v. Wallace, 32 F.3d 1171, 1174 (7th Cir. 1994). In the context of sentencing, that means that the defendant's sentence would have been different but for the error. United States v. Bauer, 129 F.3d 962, 964 (7th Cir. 1997); United States v. Hicks, 129 F.3d 376, 378 (7th Cir. 1997). There is no question here that the district court relied significantly on Fedderly's protected statement--the court cited that statement no less than three times as it overruled Fedderly's objection to the enhancement. Yet, even when Fedderly's statement is excluded from the analysis, there is ample evidence which establishes that he possessed the gun during the conspiracy and which affirmatively links the gun to his narcotics activity. This evidence we have already noted: the gun was found in the stolen mobile home that Fedderly possessed for several days prior to his arrest; Fedderly acknowledged to arresting officers that the gun belonged to him (R. 112 at 9); and present along with the gun in the mobile home were drug paraphernalia, a scale bearing methamphetamine reside, a container

of the kind in which witnesses had seen Fedderly store methamphetamine and which, like the scale, contained methamphetamine residue, as well as a black nylon tote bag similar to the type one witness had seen him use to transport the containers. Given these independent indicia that Fedderly possessed the gun during and in connection with the drug conspiracy, we believe that the court still would have enhanced Fedderly's base offense level pursuant to section 2D1.1(b)(1) had it not considered Fedderly's revelation that his drug supplier gave him the gun. Consequently, we are not convinced that the court's error in considering that statement was plain in the sense that it resulted in a more onerous sentence for Fedderly.

III.

Finding no error in the denial of Cashman's motion to suppress or in the calculation of Fedderly's sentencing range, we AFFIRM Cashman's conviction and Fedderly's sentence.

/1 To the extent Cashman's statement to Fedderly suggests that the gun was present in the home at the time it was stolen, we note that the owners of the motor home informed the authorities that they had never owned a firearm. See R. 112 at 11.