In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-2442

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARSHON SIMON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 16-CR-20077 — **Colin S. Bruce**, *Judge.*

ARGUED MAY 30, 2019 — DECIDED AUGUST 21, 2019

Before FLAUM, MANION, and BARRETT, *Circuit Judges.*

MANION, *Circuit Judge.* Police officers pulled Marshon Simon over for failing to signal sufficiently ahead of turning. A drug-sniffing dog alerted on Simon's car so officers searched it. They did not find drugs, but they found a gun. The government charged Simon with being a felon-in-possession. The district judge denied Simon's motions for recusal, suppression, and supplementation. Simon entered a conditional guilty plea and received a sentence of 15 years. He raises a

litany of issues on appeal. He argues the judge should have recused himself because before he was a judge he supervised a prior prosecution of Simon. He argues the judge should have suppressed the gun because the officers lacked probable cause to initiate the traffic stop and because they prolonged the stop to allow for the dog sniff. He argues the dog's alert was false and the dog was unreliable because he was improperly trained. He argues the judge should have allowed him to supplement the evidence after denial of suppression. Finally, he argues one of his prior felonies should not have counted as a predicate for purposes of the Armed Career Criminal Act. Concluding the judge committed no reversible error in denying Simon's motions, we affirm.

## I. Facts

On the night of August 21, 2016, three police officers in a "bike patrol unit" surveyed a particular section of Decatur, Illinois. Officers Jason Danner and Jamie Hagemeyer rode bicycles. They sat behind a propane tank 145 yards from the intersection of College and Green Streets. Officer Robert Hoecker drove a squad car nearby.

The bicycle officers saw a vehicle driven by Marshon Simon leave the 1100 block of North College Street (five blocks away) and drive toward them. As Simon approached the intersection of College and Green Streets, he failed to signal at least 100 feet before turning left from College onto Green. This was according to the bicyclists' testimony at the suppression hearing, which the district judge credited. At the bicyclists' request, Hoecker pulled Simon over at 10:26 p.m.

Hoecker approached Simon's car and made contact. Hoecker introduced himself and told Simon the basic reason

for the stop. Hoecker explained bicycle officers would arrive and provide details. Simon questioned the basis for the stop. Simon gave his driver's license and proof of insurance to Hoecker. According to Hoecker, Simon was cooperative and polite, behaved normally, and was no more nervous than the normal level of traffic-stop nervousness. Hoecker ran Simon through the LEADS computer system and found he was validly licensed and insured. Hoecker finished this check in less than 2 minutes, before Danner and Hagemeyer arrived on scene at about 10:29 p.m.

Once Danner and Hagemeyer arrived they took over "processing the ticket," including some double-checking. Hoecker's role was to assist. Hoecker told Danner that Simon had insurance and a valid license. Hoecker said he "didn't know if [Danner] wanted the dog or not." (Appellant Br. at 8, quoting Hoecker's dashcam video.) Danner asked if Simon had any criminal history. Hoecker then ran a criminal-history check and found Simon had prior drug and weapon charges.

Danner made contact with Simon. Danner testified Simon appeared abnormally nervous. Danner testified Simon asked about the violation and insisted he used his turn signal. Danner testified, "I observed him to pull his hand away from his lap, and he was shaking pretty good, indicating to me that he appeared nervous." But Danner did not note this in the police report and he did not mention this when discussing whether to call a dog.

Hagemeyer testified that while speaking briefly with Hoecker he handed her Simon's materials. She then went to another squad car that had arrived on scene "to begin the written warning." Both Danner and Hagemeyer testified about the various steps and processes a bike patrol unit

completes as part of the mission instigated by a traffic viola-
tion, including monitoring and securing the scene, making
contacts with the driver, running computer checks, and writ-
ing out the warning or ticket.

Danner decided to call a dog. He testified he decided to
call a dog at about 22:30:38 (10:30:38 p.m.) on the clock of
Hoecker's dashcam, about 1 minute after Danner and Hage-
meyer arrived at the traffic stop. An officer called for the ca-
nine unit less than 4 minutes into the stop, when the ticket
was still being processed, according to the officers' testimony.

Canine handler Snyder arrived with Rex at the scene at
about 10:33 p.m. At that time, the traffic violation was still be-
ing processed, according to the officers' testimony.[1] Within a

---

[1] Here are excerpts on point from the bicycle patrol unit's testimony:
Q: And when Officer Snyder arrived, was the traffic violation still being
processed?
**Hoecker:** Yes.
(Tr. Continuation of Suppression Hr'g, July 12, 2017, DE 44 at 19:1–19:3.)

Q: And do you recall approximately how long into the traffic stop it would
have been that [Officer Snyder, with Rex] arrived?
**Danner:** I believe it was around six or seven minutes.
Q: And were you still processing the traffic ticket at that time?
A: That's correct.
(*Id.* at 50:19–50:24.)

**Hagemeyer:** From the time we arrived to the time Officer Snyder arrived
was three or four minutes.
Q: So a very short period of time?
A: Very short period of time.
Q: Were you still working on the traffic ticket at that time?
A: Yes.
Q: And still working on it diligently, correct?
A: [Nodding head up and down.]

few seconds of walking around Simon's car, Rex alerted. Snyder took less than 20 seconds to prepare Rex, begin the search, and confirm the alert. The time period from the beginning of the stop to the alert was about 7 minutes. Hagemeyer testified she had no part in conducting the actual dog sniff. She testified she "was writing the warning." She confirmed on cross-examination that she filled out the traffic warning, and that Danner issued it to Simon. Defense counsel asked, "So you were the one who filled out the date, time, name, address, and birth date?" Hagemeyer answered, "I filled out the majority of it. I believe [Danner] signed it, though."

After the alert, Simon became angry and insisted there were no drugs in his car. Danner asked Simon to step out of his car. The police searched it. They did not find drugs, but they found a gun. An officer drove Simon to the police station. Danner handed Simon a traffic citation as he was released from the station. Danner testified he filled out the citation.

## II. Procedural posture

Since Simon was a felon, the government charged him with being a felon in possession of a firearm. The case was assigned to Judge Bruce. Simon moved Judge Bruce to recuse himself because he had served as the First Assistant United States Attorney for the Central District of Illinois with supervisory authority over a prior case against Simon culminating in conviction. Judge Bruce denied the recusal motion.

Simon moved to suppress the gun, arguing there was no probable cause to stop his car, the police impermissibly extended the stop to get a dog on scene, and the dog was unreliable and improperly trained. Judge Bruce held an

_____

(*Id.* at 87:24–88:7.)

evidentiary hearing over parts of three days and heard testimony from seven witnesses. He found the officers credible, even if at times confused. He found the officers had probable cause to think Simon committed a traffic violation, the officers did not unreasonably prolong the stop, and Rex was a properly trained and certified canine whose alert can lead to probable cause. The judge denied the motion to suppress.

Simon moved to supplement the record with additional, unrelated traffic citations issued by Danner (to show the differences in the officers' handwriting to address the issue of which officer wrote Simon's citation) and a video made by a defense investigator (to contradict the officers' version of events leading up to the traffic stop). The judge denied this motion.

Simon pleaded guilty conditioned on preserving his right to appeal. He received an enhancement as an Armed Career Criminal. The judge sentenced him to 15 years in prison, the mandatory minimum.

Simon appeals the denials of his motions to recuse, suppress, and supplement. He also appeals his qualification as an Armed Career Criminal, arguing his prior conviction for attempted armed robbery in Illinois in 2000 did not qualify as a violent felony.

### III. Analysis

**A. Recusal**

Simon seeks remand because he claims Judge Bruce's handling of this case conveys the appearance of impropriety. Simon does not claim Judge Bruce actually had or acted on any unfair bias against Simon.

Simon argues Judge Bruce should have recused himself under 28 U.S.C. § 455(a): "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Below, Simon also sought recusal under 28 U.S.C. § 455(b)(3), but he no longer presses that on appeal.

As the government agrees, we review a preserved § 455(a) claim *de novo*. *Cf. Fowler v. Butts*, 829 F.3d 788, 793 (7th Cir. 2016) (holding § 455(a) can be vindicated on appeal); *United States v. Dorsey*, 829 F.3d 831, 835 (7th Cir. 2016) (a preserved § 455(b) claim is reviewed *de novo*).

To win recusal under § 455(a), a party must show a reasonable, well-informed observer might question the judge's impartiality. *United States v. Herrera-Valdez*, 826 F.3d 912, 917 (7th Cir. 2016). In other words, the party must show an objective, disinterested observer fully informed of the reasons for seeking recusal would "entertain a significant doubt that justice would be done in the case." *Id.*

Simon sought recusal early in the case on the ground that Bruce served as First Assistant United States Attorney for the Central District of Illinois from 2010 through 2013. During that time, the government charged Simon with violating 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). Bruce supervised the AUSA assigned to that case. Simon pleaded guilty and was sentenced in 2012 and again (after a successful appeal) in March 2013. This prior criminal case involved occurrence facts separate from those in the present case. But the prior case is directly relevant to this case because the conviction in the prior case enhanced Simon's sentence in this case as an Armed Career Criminal.

Judge Bruce denied the recusal motion. He noted he could not remember any participation in past prosecutions of Simon. Judge Bruce observed that even if he did participate in a past prosecution, he did not participate in the current prosecution, "which consists of new charges, wholly unrelated to those brought against [Simon] in the past." (Text Order, Dec. 6, 2016.)

Simon likens this case to *United States v. Herrera-Valdez*. There, the government prosecuted a defendant for illegal reentry after deportation. Before trial on the illegal-reentry charge, defendant moved to disqualify Judge Der-Yeghiayan because he had served as the District Counsel for the Immigration and Naturalization Service when defendant was deported. District Counsel Der-Yeghiayan's name was listed in several places in INS's briefing supporting deporting. Judge Der-Yeghiayan denied the motion to disqualify and defendant appealed. We observed that 28 U.S.C. § 455(a) requires a judge to "'disqualify himself in any proceeding in which his impartiality might reasonably be questioned.'" *Herrera-Valdez*, 826 F.3d at 917. We reversed the denial of disqualification, concluding "a reasonable, disinterested observer could assume bias from the fact that the judge presiding over the defendant's prosecution for illegal reentry was the same person who ran the office that pursued, and succeeded in obtaining, the removal order that is the source of his current prosecution." *Id.* at 919. We noted this was particularly true given that the linchpin of defendant's case against the illegal-reentry charge was a collateral attack against the removal order. The judge need not have been actually involved in the prior case or be actually biased in the subsequent case to trigger the requirement to recuse under § 455(a).

But here, the prior case does not directly give rise to or underly the present case. And here, Simon attempts no collateral attack against the prior conviction. Simon's 2011 conviction was not, and could not have been, the linchpin to his defense in this subsequent case. A defendant in a federal sentencing proceeding may not collaterally attack a prior conviction used to enhance his sentence, with an exception not relevant here. *See Daniels v. United States*, 532 U.S. 374, 382–83 (2001); *Custis v. United States*, 511 U.S. 485, 487 (1994). Any collateral attack against the prior conviction under 28 U.S.C. § 2255 would have been time-barred. So there was no possibility of Judge Bruce adjudicating the merits of a collateral attack against Simon's 2011 conviction here. And consequently there was no reason to think Simon might have declined to launch a collateral attack against the 2011 conviction because he feared Judge Bruce would not be receptive to such an attack, or would punish him in the present case for making such an attack.

The prior and subsequent cases at issue in *Herrera-Valdez* are directly related in a way the prior and subsequent cases at issue here are not. A closer analogy to *Herrera-Valdez* is Simon's prior conviction under the supervision of First AUSA Bruce and the proceedings for revocation of supervised release involving that prior conviction and the gun possession on August 21, 2016. Simon's prior conviction directly gives rise to and underlies the revocation proceedings. So Judge Bruce recused himself from them.[2] As this relationship is not

_____

[2] Simon asserts Judge Bruce recused himself from the revocation proceedings (2:11-cr-20002). The government does not contest this assertion. The docket for that case neither confirms nor denies the recusal. We take Simon's word for it.

present between Simon's prior case and the current felon-in-possession case, there was no need for Judge Bruce to recuse himself here.

True, the prior conviction enhanced the sentence for the present conviction under the ACCA. But this is mere happenstance. It is not the same kind of direct connection we found problematic in *Herrera-Valdez*. Another distinction between *Herrera-Valdez* and this case is that there, the future judge's name was on the briefs against the defendant, but here the future judge's name was not on the briefs. This is a relevant consideration because it bears on public perception. We do not consider this to be a controlling factor by itself, but it is relevant.

Judge Bruce did not err in refusing to recuse.

## B. Suppression

Simon raises a series of potential errors regarding the denial of suppression. He argues there was no probable cause to believe a traffic violation occurred, and therefore initiating the stop was unconstitutional. He argues the officers unconstitutionally prolonged the traffic stop. And he argues Rex's alert was false and Rex was improperly trained. "We employ a mixed standard of review on motions to suppress, reviewing the district court's factual determinations for clear error and *de novo* its ultimate determination about whether the police had sufficient grounds to stop or search the individual." *United States v. Rodriguez-Escalera*, 884 F.3d 661, 667 (7th Cir. 2018) (internal quotation marks omitted).

### 1. Initiating the stop

Simon argues the officers lacked probable cause to believe he committed a traffic violation, so they had no probable

cause to stop him. If Simon were right, then the court should have suppressed the gun as fruit of the poisonous tree. The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. Whenever police stop a car, the stop must satisfy the Fourth Amendment's reasonableness requirement. *Delaware v. Prouse*, 440 U.S. 648, 663 (1979). If a search or seizure violates the Fourth Amendment, a court will generally exclude resulting evidence. *United States v. Wilbourn*, 799 F.3d 900, 910 (7th Cir. 2015).

Simon goes so far as to assert he did not commit a traffic violation. He argues the government did not meet its burden of proof to establish he actually committed a traffic violation. But the government had no such burden. Whether Simon committed a traffic violation is irrelevant for Fourth Amendment purposes so long as the officers had probable cause to think he did. *United States v. Lewis*, 920 F.3d 483, 489 (7th Cir. 2019) ("The officer is not the judge. Whether the driver actually committed a traffic infraction is irrelevant for Fourth Amendment purposes so long as there was an objective basis for a reasonable belief he did.").

Generally, the decision to stop a car is reasonable, and comports with the Fourth Amendment, "where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). Probable cause exists when "the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense." *United States v. Cashman*, 216 F.3d 582, 586 (7th Cir. 2000). Probable cause is an objective standard, based on the totality of the circumstances. *Lewis*, 920 F.3d at 489. If an officer reasonably thinks he sees a driver commit a traffic infraction, that is a sufficient basis to pull him

over without violating the Constitution. *United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005).

Here, Simon acknowledges the probable cause determination depends entirely on the credibility of the two officers on bicycles who testified they saw him turn without signaling at least 100 feet ahead. Simon levies many attacks on their credibility, urging us to reverse under the clear error standard. Simon admits the clear error standard is very demanding. Under this standard, we only reverse when, after reviewing the record as a whole, we have a "definite and firm conviction" a mistake has been made. *United States v. Whitley*, 249 F.3d 614, 621 (7th Cir. 2001). The district judge, after all, listened to the testimony directly and observed the demeanor of the witnesses. *United States v. Garrett*, 757 F.3d 560, 568 (7th Cir. 2014). The district judge is in a much better position to evaluate credibility than we are. His credibility determinations are entitled to special deference. We take Simon's credibility attacks in turn.

*i. Phantom stop sign*

First, Simon argues Hagemeyer swore at the suppression hearing that there was a stop sign at the corner of College and Green, but she was demonstrably and indisputably wrong. Simon argues this impugns her claim she saw the traffic violation.

The judge directly confronted Hagemeyer's mistake. He noted Hagemeyer "was wrong about that detail." (Order, DE 21 at 4.) The judge said he would take the mistake into account in assessing Hagemeyer's credibility. But the judge concluded the mistake does not weigh heavily against her credibility because the detail "is not greatly important regarding the traffic

offense for which Defendant was pulled over" and because
"[i]t would not have factored in to [sic] determining whether
or not to issue Defendant a ticket for failing to signal his turn
within not less than 100 feet of the intersection." (*Id.*) Hage-
meyer's determination at the scene that Simon failed to signal
at least 100 feet before the turn was not informed by the pres-
ence or absence of a stop sign at the corner. In other words,
there were other reasons independent of the presence or ab-
sence of a stop sign for Hagemeyer to think Simon failed to
signal at least 100 feet ahead of turning. Indeed, the presence
or absence of a stop sign is irrelevant to estimating distances
or to the requirement to signal. The judge simply did not find
this mistake about a stop sign to be very important. So the
mistake did not significantly undermine the reliability of
Hagemeyer to perceive other facts that night. Moreover, her
mistake about the stop sign has no bearing on Danner's testi-
mony that he saw Simon fail to signal sufficiently ahead of
turning.

And as for the possibilities Hagemeyer lied about the stop
sign, and this lie undermines her credibility about everything
else, Simon does not go quite so far. In his opening appellate
brief, he does not directly, unequivocally accuse Hagemeyer
of intentionally lying about the stop sign. And Simon offers
no explanation for why Hagemeyer would have had any rea-
son to lie about it. We see no clear error here.

*ii. Distances*

Second, Simon argues Hagemeyer and Danner were
wrong about the distance between their location and the in-
tersection of College and Green. They both testified the dis-
tance was 75 yards. But the distance was actually 145 yards.
The officers' testimony was demonstrably and indisputably

wrong by a wide margin. Simon argues the officers' ability to judge distance was the key to their claim Simon committed a traffic violation. He argues their failure to estimate the distance between their location and the intersection correctly makes their claims about the distance between the location of Simon's car when he activated his turn signal and the intersection wholly incredible.

Again, the judge directly confronted the mistaken testimony. The judge decided the miscalculation was "of little import when it comes to credibility." (Order, DE 21 at 3.) The judge reasoned that the fact that both officers estimated the distance at 75 yards does not indicate collusion because if they wanted to connive it is much more likely they would have used a number closer to the actual distance. They were too wrong to be conspiring to lie.

And as for the argument that the officers' mistake about this distance undermines the credibility of their estimate about Simon's signaling distance, the officers had other, specific indicia of the signaling distance beyond a raw estimate of the distance from A to B. The time between signaling and turning, the car lengths between signaling and turning, and the lengths of the headlight beams bolstered the probable cause to think Simon signaled too late and too close. The judge concluded the mistake about the distance between the bicyclists' location and the intersection shows nothing more than that both bicyclists were wrong about that distance. We see no clear error here.

*iii. Photographs*

Third, Simon argues photographs introduced into evidence show the unbelievability of the officers' claims. Danner

and Hagemeyer both testified they saw Simon's car leave the 1100 block of North College, five blocks from their position. But, Simon argues, the photographs speak for themselves, and there is no way someone could see the make, model, or color of a vehicle at that distance.

The judge simply disagreed. He examined the photographs and listened to the testimony and concluded "it is possible for an average person, with good vision who is used to working at night, such as Danner and Hagemeyer, to see a car, in the dark, turn onto a street with its headlights on." (Order, DE 21 at 4.) We also examined the photographs and read the testimony, and we do not have anything close to a definite and firm conviction the judge made a mistake in this regard. Sometimes a photograph is not worth a thousand words.

*iv. Ghost writer*

Fourth, Simon argues the judge ignored the officers' misstatements about who prepared the traffic ticket. Hagemeyer testified "I was writing the warning." She answered "yes" to the question: "[Y]ou said that you filled out the traffic warning in this case?" When asked if she was the one who filled out the date, time, name, address, and birth date, she testified she "filled out the majority of" the ticket herself, but she believed Danner signed it. But other evidence showed she filled out none of it. Danner filled out both the traffic citation (later voided) and the warning (Simon received hours later).

Simon accuses the judge of tying himself "into a pretzel to avoid finding that the police officers could possibly have lied or misrepresented facts … ." (Appellant Br. at 33.) But the judge committed no such contortions. Rather, he addressed the discrepancies directly. He combed through the testimony

about the various steps in the process leading to handing a driver a written ticket or warning. He noted there appeared to be confusion and possibly contradiction between the officers about who actually wrote the ticket. One source of confusion seemed to be the word "processing." The judge observed Hagemeyer, Snyder, and Hoecker all testified Hagemeyer began "processing" the ticket, but "processing" a ticket involves much more than just physically writing the ticket. The judge also observed Hagemeyer's testimony on this issue was more specific. She testified, "I was writing the warning." When asked, "So you were the one who filled out the date, time, name, address, and birth date?" she responded, "I filled out the majority of it. I believe [Danner] signed it, though."[3]

The judge compared the warning Simon received—purportedly filled out by Hagemeyer and signed by Danner—to a different warning definitely filled out and signed by Hagemeyer on a different date. The judge concluded the handwriting on the two warnings is different and they likely were not filled in by the same officer.

But the judge noted Simon did not show the exemplar warning to Danner or Hagemeyer during the hearing to cross-examine them on who wrote Simon's warning. The judge also

---

[3] In his order denying suppression, the judge characterized Hagemeyer's testimony on this point slightly incorrectly, and in favor of Simon's arguments. The judge wrote "Hagemeyer answered 'yes' to whether she filled in the name, date, etc., but she stated that Danner signed it." (Order, DE 21 at 10.) Actually (according to the transcript) she did not say "yes" in response to this question. She said, "I filled out the majority of it. I believe [Danner] signed it, though." But even giving Simon the benefit of this characterization, the judge still did not find a significant credibility problem.

noted the testimony indicated Danner or Hagemeyer would often start writing a ticket the other would finish. The judge observed: "There are numerous possibilities as to why the discrepancy exists, and without the officers being given the chance to explain the discrepancy, the court cannot impute improper conduct on their part." (Order, DE 21 at 11.) The judge considered the totality of the officers' testimony, and their demeanor and appearance. He concluded any discrepancy on this issue was due to mere confusion on the part of the officers, and not to fabrication. And he concluded the officers were credible.

We see no clear error regarding the judge's decisions on any of these issues, nor regarding his decision to find the officers credible. Given the two bicycle officers testified they saw Simon commit a traffic infraction, and given the judge believed them, we see no reason to reverse the decision that probable cause justified starting the stop.

**2. Conducting the stop**

Simon argues even if the officers did not violate the Constitution by initiating the stop, they violated it by impermissibly prolonging the stop. An officer who reasonably starts a traffic stop might violate the Constitution if he exceeds the scope of the stop or unreasonably prolongs it. *Lewis*, 920 F.3d at 491. A traffic stop "'can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614–15 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).

A dog sniff of a car's exterior only for illegal drugs *during* a lawful stop for a traffic violation does not violate the Fourth

Amendment, even absent reasonable suspicion of drugs. *Caballes*, 543 U.S. at 410. But a stop justified only by a traffic violation becomes unconstitutional if the officers prolong it beyond the time reasonably required to complete the stop's original mission. *Rodriguez*, 135 S. Ct. at 1612. "An officer may conduct certain unrelated checks—including a dog sniff—during a lawful traffic stop, but he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Lewis*, 920 F.3d at 491 (internal quotation marks omitted). As Simon concedes, "calling a K-9 unit does not unlawfully extend a traffic stop as long as the normal process for pursuing a traffic ticket is ongoing." (Appellant Br. at 36.)

Without independent reasonable suspicion to justify the sniff, the critical question is not whether the dog sniffed before or after the officer issued the warning, "but whether conducting the sniff prolongs—*i.e.*, adds time to—the stop." *Lewis*, 920 F.3d at 491 (internal quotation marks omitted). With independent reasonable suspicion, however, the officer may constitutionally detain the suspect for the sniff even if it adds time to the total stop. *Id.*

Here, the judge continued to credit the officers' testimony. Based on that testimony, the judge concluded the stop was not improperly prolonged to allow Rex to sniff. The judge noted the time period from the beginning of the stop to the canine alert was about 7 minutes, as Simon conceded. The judge determined the officers acted quickly. Hoecker made the stop, exited his car, told Simon the reason for the stop, and gathered his information. The bicyclists arrived at the stop only a couple minutes after Hoecker pulled Simon over. The bicyclists "diligently began processing the ticket." (Order, DE 21 at 15.)

Crucially, the judge found no indication the officers engaged in any activity other than securing the scene and processing the warning during the time between the bicyclists' arrival and Rex's arrival. Specifically, the officers surveyed the scene, Danner spoke with Simon, and Hagemeyer testified she went to the squad car to begin processing the written warning. The video indicated that about 2.5 minutes into the stop, Danner was speaking to Hoecker about the traffic violation. About 3 minutes into the stop, Danner left the squad car to speak with Simon. Danner told Simon the reasons for the stop and gathered information. Hoecker returned to Simon's car at about the 5-minute mark to speak with him about the traffic infraction. Less than 7 minutes into the stop, Rex arrived and very quickly alerted. At that time, the bicycle officers were still processing the ticket.

In sum, the judge concluded the officers were processing the ticket when Rex arrived and alerted, so they had not yet completed the initial mission of the stop, and the stop was not improperly prolonged to allow Rex to sniff.

Simon argues the police report and testimony contain the "misrepresentation" Hagemeyer was writing the warning while the officers waited for Rex because the officers knew calling a canine unit does not unlawfully extend a stop so long as the normal process for pursuing a traffic ticket is ongoing. Simon continues to challenge the credibility of the officers. He argues that at no point did any officer on the scene begin effectuating the purpose of the stop by dutifully and diligently filling out a warning or ticket. He claims Danner filled out both the traffic citation and the warning Simon received hours after the stop. But again we see no reversible error in the judge's conclusions on this point.

Simon presses that even if the judge's credibility determinations here are correct, his ruling is still flawed. First, Simon argues the judge improperly allowed a *de minimis* delay to be constitutional, even though *any* delay to allow a dog to sniff is unconstitutional absent independent reasonable suspicion. We disagree with Simon about what the judge did. He specifically found there was *no* improper delay. (Order, DE 21 at 14 ("the stop was not purposefully prolonged to allow for the canine unit's arrival").) True, the judge added in a footnote that even if he found the ticket-writing process had not begun when Rex arrived, still the sequence of events was so short and condensed that the stop was not prolonged in any "meaningful" way. But we need not review this dictum.

Second, Simon argues that instead of effectuating the purpose of the traffic stop, the officers decided to run a criminal-history check. Simon argues this was unrelated to the mission of the stop and delayed processing the traffic violation. Simon cites no supporting Seventh Circuit case. We said last year that when police conduct a stop, "they are entitled to demand the driver's identification, of course, and it is routine to check the driver's record for active warrants, driving history, and criminal history. Those checks are done for important reasons, including officer safety." *Swanigan v. City of Chicago*, 881 F.3d 577, 586 (7th Cir. 2018); *see also United States v. Sanford*, 806 F.3d 954, 956 (7th Cir. 2015) ("The trooper checked the occupants' criminal histories on the computer in his car—a procedure permissible even without reasonable suspicion … .").

We considered all Simon's arguments, but we see no reason to reverse the judge's conclusions that the officers were in the process of completing the traffic warning when Rex

arrived, and the officers did not improperly prolong the traffic stop to allow the sniff to occur.

### 3. *Bona Fido*?

Simon argues even if the officers had probable cause to pull him over, and even if they did not prolong the traffic stop to wait for Rex, still the judge should have suppressed the gun because Rex's alert was false, Rex was improperly trained, and the alert did not provide probable cause to justify searching Simon's car.

Probable cause to conduct a search is not among the highest standards. "A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013) (internal quotation marks and brackets omitted). Probable cause is less than preponderance of the evidence. *Id.* "All we have required is the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Id.* (internal quotation marks and brackets omitted). Probable cause is a practical, common-sense standard, involving the totality of the circumstances. *Id.*

A dog's alert on a car can give probable cause to search the entire car. Indeed, a good dog's alert can provide a rebuttable presumption of probable cause to search:

> If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog

has recently and successfully completed a train-
ing program that evaluated his proficiency in lo-
cating drugs.

*Id.* at 1057. The ultimate question is "whether all the facts sur-
rounding a dog's alert, viewed through the lens of common
sense, would make a reasonably prudent person think that a
search would reveal contraband or evidence of a crime. A
sniff is up to snuff when it meets that test." *Id.* at 1058.

Simon concedes Rex passed certification tests. But Simon
challenges the alert itself and the adequacy of Rex's training.

"First and foremost," Simon argues Rex did *not* alert on
Simon's car. (Appellant Br. at 42.) This perplexes. Simon cites
nothing to support this claim. The record belies it. Given the
context of this claim, Simon seems simply to mean the alert
was false.[4] It is true that following the alert the officers
searched the car and found no evidence of drugs in it. But Si-
mon does not explain why that, in itself, matters here. Proba-
ble cause is not a retrospective, outcome-based standard.

---

[4] Defense expert Dr. Mary Cablk said in her report she could not de-
termine if Rex alerted or what Rex alerted to. She confirmed this on cross-
examination at the suppression hearing. During direct examination she
watched videos from Hoecker's and Snyder's dashcams. She testified she
could not see the alert, could not tell exactly where on the car the dog
alerted, and did not know whether the alert was barking or something
else. But in her testimony she seems to accept Rex alerted. She character-
ized it as a false alert because no drugs were found, and she criticized
Snyder for rewarding Rex for falsely alerting: "In this instance, there's no
drugs found; so he's reinforcing the dog for false alerting here." In any
event, Snyder testified that Rex alerted and that Snyder confirmed the
alert. And the judge throughout his order accepted Rex alerted. He found
the officers' testimony, in its totality, credible. We see no reason to upend
the determination Rex alerted.

*Bridewell v. Eberle*, 730 F.3d 672, 675 (7th Cir. 2013). If an officer randomly breaks into a house on only a wild hunch and stumbles into a meth lab, the discovery does not provide probable cause for the search. And if 20 reliable informants tell an officer a particular house contains a meth lab, so he stands in the street outside the house and sees through an open window the apparent apparatus and accoutrements of a meth lab, so he obtains a warrant to search the house based on probable cause to think it contains a meth lab, but he finds only an innocent and intricate chemistry set, still probable cause supported the warrant. So the mere absence of drugs in Simon's car does not undermine the probable cause to search it for drugs, provided there was probable cause in the first place.

Simon's other argument is the officers did not have probable cause to search his vehicle in the first place because Rex was unreliable. This argument proceeds in two waves.

The first wave is quickly quelled. Simon argues Rex was unreliable because he was not trained properly under Illinois law, which requires police dogs be trained according to certain guidelines. Simon argues Detective Larner (the Macon County canine-training director) admitted he did not always follow these guidelines. But we need not address what Illinois law requires or whether Rex satisfies it because Illinois law does not control the Fourth Amendment. *See Virginia v. Moore*, 553 U.S. 164, 172 (2008) ("[T]he Fourth Amendment's meaning [does] not change with local law enforcement practices—even practices set by rule."); *California v. Greenwood*, 486 U.S. 35, 43 (1988) ("We have never intimated … that whether or not a search is reasonable within the meaning of the Fourth Amendment depends on the law of the particular State in which the search occurs.").

The second wave holds out longer, but ultimately suc-
cumbs. Simon argues, apart from Illinois law, if a dog is
trained to alert when no evidence of criminal activity exists,
this violates the Fourth Amendment. The problem, as Simon
sees it, is Rex was trained with scented cotton balls to alert to
residual odors. But to search a car, there must be probable
cause to think it presently contains evidence of criminal activ-
ity. So if Rex is trained to alert to mere residue even when no
drugs are present, then his alert is not a reliable indicator
drugs are present, and therefore his alert does not provide
probable cause to justify a search.

The main problem with this argument is the Supreme
Court already rejected its premise. In *Florida v. Harris*, a dog
named Aldo alerted on a truck. A subsequent search did not
reveal any of the drugs Aldo was trained to detect, but it did
discover meth ingredients. The defendant moved to suppress
the ingredients on the ground that Aldo's alert had not given
probable cause to search. The defendant "principally con-
tended" in the trial court that because the officer did not find
any of the drugs Aldo was trained to detect, Aldo's alerts
must have been false. *Harris*, 133 S. Ct. at 1058. But the Su-
preme Court patted Aldo on the head and called him a good
boy: "A well-trained drug-detection dog *should* alert to [resid-
ual] odors; his response to them might appear a mistake, but
in fact is not." *Id.* at 1059; *see also Miller v. Vohne Liche Kennels,
Inc.*, 600 F. App'x 475, 477 (7th Cir. 2015) (Plaintiff's "only de-
veloped legal theory is untenable. [His] premise—that an alert
by a drug-sniffing dog trained to detect residual odors does
not establish probable cause to search—was rejected in *Harris*
… ."). If a well-trained dog, trained to alert even to residual
odors, alerts, there is generally a fair probability that drugs or
evidence of drugs will be found, absent contradictory factors.

And that is all the Fourth Amendment requires. If somehow a dog were trained to alert *only* to residual odors, then we might have a problem. But that is not this case.

Our review of the record and the order denying suppression satisfies us the judge conducted the proper *Harris* evaluation and committed no error in concluding Rex's satisfactory certification and training provide sufficient reason to trust his alert or in concluding Rex's training on residual odors is acceptable. The judge heard testimony from Simon's expert Dr. Cablk challenging Rex's qualifications and the sniff itself, testimony from Officer Snyder supporting Rex's qualifications and the sniff itself, and testimony from Detective Larner supporting Rex's qualifications and the sniff itself. The judge also entertained arguments from both sides in the form of the motion to suppress, supporting memorandum, the government's response, and post-hearing briefs filed by both sides. The judge considered the totality of the circumstances, addressed *Harris*'s ultimate question, and found Rex's sniff up to snuff.

## C. Supplementation

After the judge denied the motion to suppress, Simon moved to supplement the record and for leave to seek reconsideration. He wanted to reopen the evidence to introduce further, unrelated citations prepared by Danner in August 2016 "which further emphasize the differences in the officers' handwriting … ." (Mot. Supp., DE 23 at 4.) Simon also wanted to introduce a video he[5] took when he returned to the scene one night. The video shows a vehicle leaving the 1100 block of College Street and approaching the intersection of College

---

[5] The motion says Simon created the video. On appeal, Simon asserts his investigator took the video. This nuance is immaterial here.

and Green. The judge denied this motion. On appeal, Simon only presses the video. He does not mention the additional handwriting exemplars in his opening appellate brief. Simon acknowledges we review the denial of supplementation for abuse of discretion.

The judge did not abuse his discretion. He explained there was no reason Simon could not have taken a nighttime video and presented it during the suppression hearing. The judge discussed the danger of allowing supplementation here and setting a bad precedent leading to a never-ending cycle of parties waiting for rulings and then coming up with "new" evidence to challenge them. Most importantly, the judge explained that even with the proposed evidence, his ruling would not change. The nighttime video would not capture the actual visual capabilities of the officers, who credibly testified about how close Simon was to the intersection when he signaled. The judge reasoned a video of the scene taken months later, when conditions might differ, would not impact their credibility. Besides, the judge noted, the probable cause standard does not need evidence to support a conviction beyond a reasonable doubt. He did not abuse his discretion.

## D. ACCA

Simon argues his prior conviction under Illinois law for attempted armed robbery should not have counted as a predicate offense under the Armed Career Criminal Act. He recognizes our decisions foreclose his argument on this point, but he wants to preserve it for the Supreme Court.

## IV. Conclusion

We considered all Simon's arguments. Finding no reversible error, we AFFIRM.