2023 IL App (2d) 210001-U
No. 2-21-0001
Order entered May 11, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Boone County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-164 |
| RUBEN A. RUIZ, | ) ) ) | Honorable C. Robert Tobin, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE McLAREN delivered the judgment of the court.
Justices Hutchinson and Kennedy concurred in the judgment.

**ORDER**

¶ 1  *Held*: The trial court properly found that the traffic stop involving defendant was not unreasonably prolonged where troopers had an objective reasonable suspicion of criminal activity. Trial court is affirmed.

¶ 2  Following a stipulated bench trial defendant, Ruben A. Ruiz was convicted of two counts

of aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(1)(3)(A),[1] (a)(1)(3)(C) (West

_____

[1] The statutory subsection under which defendant was convicted was held unconstitutional

by our Supreme Court in *People v. Aguilar*, 2013 IL 112116. However, because the trial court did

2018)), unlawful possession of between 15 and 100 grams of a substance containing cocaine (720 ILCS 570/402(a)(2)(A) (West 2018)), and unlawful possession of methamphetamine (less than five grams) (720 ILCS 646/60(b)(1) (West 2018)). Defendant's convictions were based on the discovery of contraband following a traffic stop and a dog sniff. On appeal, defendant argues that 1) the trial court erred by denying his motion to suppress evidence, 2) he received ineffective assistance of counsel, and 3) the trial court abused its discretion in sentencing him given his numerous mitigating factors. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      This case involves a traffic stop of a vehicle in which Miguel, defendant's brother, was the driver, and defendant was a passenger. Prior to trial, defendant and Miguel filed motions to quash arrest and suppress evidence.

¶ 5      At the hearing on the motions to suppress, Illinois State Trooper Greg Melzer testified as follows. On May 4, 2018, Melzer was parked in the center emergency crossover on I-90 watching westbound traffic. Melzer saw a white Cadillac following a tractor trailer too closely on I-90. By using the timer function on his radar, Melzer determined that the Cadillac was travelling .7 seconds behind the tractor trailer, which was a traffic violation. Melzer pulled out into the highway, followed the Cadillac for about four miles, activated his lights, and stopped the Cadillac after it proceeded through a toll both at the Genoa Road exit. Melzer's squad car was equipped with a video camera. The video recording taken from Melzer's squad car camera was admitted into evidence. We note that the time stamp on the video recording establishes a timeline of events. In

_____

not sentence defendant on this conviction, defendant does not raise any issue regarding this conviction.

the description of facts that follows, parenthetical references to the time stamp represent the time of day (in hours, minutes, and seconds) at which particular events appear on the video recording.

¶ 6    Melzer testified that once the Cadillac stopped (5:43:37 p.m.), he approached it on the passenger side and saw defendant in the passenger seat and Miguel in the driver's seat. Melzer told Miguel the reason he was stopped. Miguel told Melzer that he exited at Genoa because that was where he normally exited the highway to go home to Blair, Wisconsin. Melzer saw that defendant was not wearing a seatbelt. When Melzer mentioned it to defendant, he told Melzer that he had just taken the seatbelt off.

¶ 7    Melzer did not see contraband or smell marijuana or alcohol. Upon Melzer's request Miguel provided his driver's license. Miguel's driver's license was issued by Wisconsin. Melzer asked Miguel where they were coming from and Miguel replied, "Chicago." Melzer told defendant and Miguel that he was going to issue Miguel a warning for following a vehicle too close and a warning to defendant for not wearing a seatbelt.

¶ 8    Melzer testified that he then asked defendant for his identification. When he asked defendant for his identification:

> "[Defendant] continued to keep his back against the back of the seat and move slowly. He also had his right arm, right leg, and hip against the driver's [*sic*] side door. He appeared to be pressing his back, buttocks, hip, leg, right leg, right hip against the seat and door in what appeared to me to be an effort to conceal something. He was moving very slowly and didn't fully lean forward to like reach back like most people that I've encountered would when they're retrieving something from their back pocket."

In addition, Melzer testified that defendant reached back "[s]lowly and kept himself pinned to the seat while he retrieved his wallet from his pocket."

¶ 9    Melzer testified that, next, he took defendant and Miguel's driver's licenses and asked Miguel to join him in his squad car while he prepared the warnings. At 5:45 p.m., while seated in the squad car with Miguel, Melzer sent a message to Sergeant Nicholas Colon for backup. "[O]ne of the primary reasons" Melzer requested backup was for safety concerns.

¶ 10    Melzer also testified that Miguel was "nervous" as he sat in the passenger seat of the squad car and did not look at Melzer when they spoke, which Melzer described as "abnormal." When Melzer asked Miguel again why he exited at Genoa, Miguel's answer changed. Miguel said that he took that exit because he wanted to go to McDonald's and get some gas.

¶ 11    Melzer performed name searches on the computer to first determine whether defendant and Miguel's Wisconsin driver's licenses were valid. Melzer explained that he was not able to write a written warning for a traffic violation for someone without a valid driver's license. The computer search accessed numerous databases, including a "concealed carry holder" database that indicated whether a name was registered in Illinois or any other state outside of Illinois.

¶ 12    Melzer testified that it took between six to eight minutes to complete a written warning. Melzer completed Miguel's warning in about six minutes, but he did not complete defendant's warning while at the scene. Sergeant Colon arrived at the scene at 5:47 p.m. At 5:48 Melzer called for a K-9 unit to do an open-air sniff of the Cadillac. Trooper Taylor and the K-9 unit arrived at 5:58 p.m. The entire stop lasted 15 minutes.

¶ 13    Sergeant Nicholas Colon testified as follows. Colon's squad car was equipped with a video camera. The video recording was admitted into evidence. In the description of facts that follow, parenthetical references to the time stamp represent the time of day (in hours, minutes, and seconds) at which particular events appear on the video recording. Colon arrived at the scene at 5:46:57 p.m. Colon began questioning defendant who was still seated in the Cadillac. Melzer continued to work on Miguel's written warning. Colon asked defendant questions about his trip

with Miguel. Defendant stated that he and Miguel had been in Alsip, Illinois, and were on their way back home to Blair, Wisconsin. Defendant also told Colon that the purpose of the trip was to visit an aunt who was sick in the hospital with a lung issue. After speaking with defendant, Colon walked back to Melzer's squad car and spoke to Miguel. Miguel told Colon that he and defendant had been visiting family in the Back of the Yards neighborhood in Chicago. Miguel also said that they stayed in a Baymont hotel the night before and that everyone in the family was in good health except for an aunt who had diabetes. Miguel denied going to the hospital to see anyone (5:54:01). Colon testified that when he told Miguel that his version of events did not match defendant's, Miguel "took offense." Colon returned to the Cadillac (5:54:57) and asked defendant where they stayed the night before. Defendant replied that they stayed at a cousin's house. Defendant said that one slept on the couch and the other on a La-Z-Boy chair.

¶ 14 Miguel asked Melzer if he needed a lawyer (5:54:01), and Melzer told him that he was still only going to get a written warning. Melzer also told Miguel that the inconsistencies in his and defendant's stories raised suspicions. Colon then returned to Melzer's squad car (5:55:15) and asked Miguel if he and defendant stayed the night in different places, and Miguel replied, no. Melzer then told Miguel that the Boone County K-9 was going to walk around the Cadillac (5:56:20). Miguel stated that, while in Chicago, nobody else was in the vehicle besides him and defendant.

¶ 15 Colon testified that when he asked defendant to step out of the Cadillac (5:58:05), defendant "started to maneuver his body as if he was hiding something." Colon asked defendant if he was hiding or concealing anything "possibly in his right pocket because he was kind of turning his body in a way that was making me worried that he had something." When Colon asked defendant to step out of the vehicle, defendant did not comply, so Colon opened the passenger door (5:58:13) and defendant pulled the door back to shut it (5:58:20). Colon opened the door

again (5:58:30), as Deputy Rosencrantz of the Boone County Sheriff's Department approached the Cadillac. Rosencrantz was a K-9 officer. Colon told defendant again that he needed to step out of the vehicle, and defendant moved his right hand toward his right pocket. Colon told defendant to stop moving his hands and to keep his hands where Colon could see them. "Then as [defendant] proceeded to step out of the vehicle, I told him make sure your hands are where I can see them just because he was moving real [*sic*] slow and not too urgent to get out of the vehicle." When defendant stepped out of the vehicle (5:58:41) Colon saw a "black handgun in [defendant's] front right pocket." Defendant told Colon, "I have a pistol." Colon removed the gun from defendant's pocket and secured it in Melzer's patrol car. Colon asked K-9 officer Rosencranz to pat defendant down. During the pat down (5:58:55), Rosencranz found in defendant's pocket, "a clear plastic bag containing suspected cocaine." Melzer testified that after the gun and drugs were found, defendant and Miguel were handcuffed and taken to a toll plaza to be interviewed.

¶ 16    After argument, the trial court took the case under advisement. On July 10, 2020, the court issued a written order denying defendant's motion to suppress evidence.

¶ 17    In August 2020, the matter proceeded to a stipulated bench trial wherein the trial court considered the testimony provided at the hearing on the motion to suppress and, *inter alia*, the following evidence. The substance found in the baggy in defendant's pocket was sent to the State police crime lab and tested positive for cocaine and weighed 28 grams. After being Mirandized, Miguel stated that the cocaine belonged to him, and that he gave it to defendant during the traffic stop. After defendant was Mirandized, he stated that he was holding the cocaine for Miguel. Defendant also stated that the gun was his and that he did not have a firearm owner's identification card or a concealed carry permit to allow him to lawfully have the firearm on his person. After the interviews defendant and Miguel were taken to the Boone County Sheriff's Department. As defendant was being processed, "they located a white powder substance hidden in [defendant's]

wallet." At the State police crime lab, the substance tested positive for methamphetamine and weighed .2 grams.

¶ 18     The trial court found defendant guilty of all four counts. At sentencing on October 13, 2020, the court determined that count 1 – aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(1)(3)(A) (West 2018)), merged into count 2 for purposes of sentencing. The court then sentenced defendant to concurrent terms of three years for the aggravated use of a weapon conviction, nine years for the possession of a controlled substance containing cocaine conviction, and two years for the possession of methamphetamine conviction.

¶ 19     Defendant filed a motion to reconsider which the trial court heard and denied on December 7, 2020. Defendant filed a timely notice of appeal on December 28, 2020.

¶ 20                              II. ANALYSIS

¶ 21                        A. Motion to Suppress

¶ 22     On appeal, defendant argues that the trial court erred by denying his motion to suppress evidence. Defendant concedes that the initial stop of the vehicle was proper due to the traffic violation. Defendant, however, contends that the traffic stop was unreasonably prolonged by Trooper Melzer's processing of an improper warning to defendant for failing to wear his seatbelt. The State argues the stop was properly prolonged because the troopers had reasonable suspicion that defendant was engaged in criminal activity beyond the initial purpose of the traffic stop. We agree with the State.

¶ 23     Since we are reviewing the trial court's order denying defendant's motion to suppress evidence, we apply a two-part standard of review. *People v. Timmsen*, 2016 IL 2d 118181, ¶ 11. First, we will uphold the trial court's factual findings unless they are against the manifest weight of the evidence. *Id.* Second, we review *de novo* the trial court's ultimate legal conclusion as to whether suppression is warranted. *Id.*

¶ 24    A police officer may stop and briefly detain a motorist when the officer has observed the motorist committing a traffic offense. *People v. Heritsch*, 2017 IL App (2d) 151157 ¶ 9. However, the traffic stop can become unlawful if it is prolonged beyond the time reasonably required to satisfy its initial purpose. *Id.* The United States Supreme Court has observed that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015).

¶ 25    In a routine traffic stop, the officer's mission includes not only deciding whether to issue a ticket, but also activities such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 354. Reasonable travel-plan questions ordinarily fall within the mission of a traffic stop. *U.S. v. Cole*, 21 F. 4th 421, 430 (7th Cir. 2021). Although an officer may also conduct checks unrelated to the traffic stop's mission, "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 575 U.S. at 354. "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*

¶ 26    Here, the trial court found that the initial mission of the stop, issuing Miguel a warning for following a vehicle too closely, should have been completed between 5:51 and 5:53 p.m. This finding is supported by Melzer's testimony. Defendant agrees that the stop should have ended at 5:53 at the latest, and argues that had the stop not been unreasonably prolonged, the gun and controlled substances would not have been discovered. The State argues that the stop was not unreasonably prolonged because during the time it took to complete Miguel's warning the officers had reasonable suspicion of criminal activity.

¶ 27    Reasonable suspicion requires "'specific and articulable facts which, taken together with

rational inferences from those facts,' suggest criminal activity." *United States v. Ruiz*, F. 3d 1134, 1141 (7th Cir. 2015) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). Although reasonable, suspicion is a less demanding standard than probable cause, an officer's suspicion must amount to more than a mere hunch of criminal activity. *Timmsen*, 2016 IL 118181, ¶ 9. Reasonable suspicion is an objective standard, considering the totality of the circumstances. *Id.*

¶ 28    Here, the evidence supports the trial court's determination that the officers had objective reasonable and articulable suspicion of criminal activity to further detain defendant before Melzer completed Miguel's warning. At 5:51 p.m., before Melzer had time to complete Miguel's warning, Melzer and Colon knew the following. Miguel appeared nervous even after learning that he would only receive a warning. See *U.S. v. Wardlow*, 528 U.S. 119, 124 (2000) (nervousness can raise reasonable suspicion). Miguel gave inconsistent explanations regarding why he exited at Genoa. See *U.S. v. Lewis*, 920 F. 3d 483, 493 (7th Cir. 2019) (finding reasonable suspicion based in part on the defendant's "suspiciously inconsistent" answers to travel questions)). While reaching for his identification, Ruben moved abnormally, as if he was trying to conceal something. See *id.* (Reasonable suspicion can be based on "furtive movements"). Therefore, considering the totality of the circumstances, objective reasonable suspicion of criminal activity supported detaining defendant further. Because Melzer and Colon developed objective reasonable suspicion before Melzer had time to complete Miguel's warning, they had a lawful basis to prolong the stop. Therefore, the trial court properly denied defendant's motion to quash his arrest and suppress evidence.

¶ 29    Defendant cites *People v. Ruffin*, 315 Ill. App. 3d 744 (2000), to support his argument. There, after the officer detained the defendant and his fiancée for 22 minutes, the officer asked the defendant for consent to search the vehicle. *Id.* at 747. When defendant refused, the officer told defendant that he would be detained until a canine unit arrived. *Id.* at 748. The defendant then

admitted that his fiancée possessed marijuana, which was discovered in the trunk of the vehicle. *Id.* The appellate court reversed the trial court's denial of the defendant's motion to suppress. *Id.* at 749-50. The court reasoned that the traffic stop lasting 22 minutes was a subterfuge to obtain incriminating evidence, and that the officer lacked reasonable and articulable suspicion to prolong the detention. *Id.* at 749-50. Here, there is nothing in the record to suggest that the troopers prolonged the stop as a subterfuge to obtain incriminating evidence. Trooper Melzer completed Miguel's written warning within eight minutes. During that time the troopers observed conduct that rose to the level of reasonable suspicion of criminal activity. Therefore, this case is distinguishable from *Ruffin*.

¶ 30                        B. Ineffective Assistance of Counsel

¶ 31    Next, defendant argues that his trial counsel was ineffective by counsel failing to argue, in the motion to quash arrest and suppress evidence, that defendant was arrested without probable cause based only on his possession of a firearm. Defendant asserts that the mere possession of a firearm is not a crime *per se* following the decision of our supreme court in *People v. Aguilar*, 2013 IL 112116, and that the troopers had no knowledge regarding whether defendant legally possessed the firearm at the time of his arrest. Defendant argues that, absent probable cause, the arrest was unlawful such that all the evidence, including the firearm and the controlled substances found on defendant, should have been suppressed. Defendant maintains that, had counsel asserted this argument, the motion would have been granted and would have resulted in the suppression of the firearm and the controlled substances. Defendant urges us to reverse his convictions asserting that the State could not have met its burden of proof without this evidence.

¶ 32    In response, the State contends that defense counsel's decision not to argue that the troopers lacked probable cause to arrest defendant based on his possession of a firearm was sound strategy. The State argues that defendant's attempts to conceal the firearm and the divergent stories he and

Miguel told the troopers provided probable cause to arrest defendant. According to the State, the argument now raised by defendant would have been futile.

¶ 33    Claims of ineffective assistance of counsel are evaluated under the two-pronged test announced in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). Under *Strickland*, a defendant must show both that his counsel's representation fell below an objective standard of reasonableness and that the deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687; *Albanese*, 104 Ill. 2d at 525. To succeed on an ineffective assistance of counsel claim, a defendant must overcome the presumption that the challenged conduct might be considered sound trial strategy under the circumstances. *People v. Snowden*, 2011 IL App (1st) 092117, ¶ 70. Counsel cannot be ineffective for failing to make an argument that would be futile. *People v. Holmes*, 397 Ill. App. 3d 737, 745, (2010). Therefore, where a motion to quash and suppress evidence would have failed, trial counsel is not ineffective for failing to file such a motion. *People v. Jenkins*, 2021 IL App (1st) 200458, ¶ 60.

¶ 34    We begin by considering the merits of the argument that counsel failed to make in his motion to quash arrest and suppress evidence. The fourth amendment to the United States Constitution and article 1, section 6 of the Illinois Constitution protect citizens against unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970 art. I, § 6; *People v. Bartelt*, 241 Ill. 2d 217, 255 (2011). An individual is entitled to be free from unreasonable government intrusion wherever he has a reasonable expectation of privacy. *Terry v. Ohio*, 392 U.S. 1, 9 (1968). The parameters of this right are shaped by the context in which it is asserted, because the Constitution does not prohibit all searches and seizures. *People v. Gherna*, 203 Ill. 2d 165, 176 (2003). Rather the Constitution prohibits only those that are unreasonable. *Id.*

¶ 35    Because defendant was subjected to a warrantless arrest, the arrest must have been

supported by probable cause so as not to be unreasonable under the fourth amendment. See *People v. Grant*, 2013 IL 112734, ¶ 11. Probable cause to arrest exists when the facts known to the officer and the totality of the circumstances at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime. *Id.* Whether probable cause exists is governed by commonsense considerations, and the calculation concerns the probability of criminal activity, rather than proof beyond a reasonable doubt. *People v. Hopkins*, 235 Ill. 2d 453, 472 (2009).

¶ 36    Here, defendant contends that when he was arrested, possession of a firearm outside the home was not, by itself, a crime. Defendant therefore argues that the mere sight of defendant possessing a firearm was insufficient to establish probable cause to arrest him. Defendant relies on *Aguilar*, 2013 IL 112116, wherein our supreme court struck down as unconstitutional the section of the aggravated unlawful use of a weapon statute that categorically banned the possession of an operable firearm outside the home. *Id.* ¶¶ 20-22. However, the court in *Aguilar* made clear that the right to possess a firearm for self-defense outside the home is not unlimited and is subject to meaningful regulation. *Id.* ¶ 21.

¶ 37    The Firearms Owners Identification Card Act (FOID Act) (430 ILCS 65/1 *et seq.* (West 2018)) and the Firearm Concealed Carry Act 430 ILCS 66/10(c)(2) (West 2018)), are examples of such meaningful regulation, and defendant in the instant matter was convicted of violating the former act. Nevertheless, on the date of defendant's arrest, possession of a firearm outside the home was not, in and of itself, a crime. It therefore follows that the mere observance of a firearm on an individual's person, without more, is insufficient to establish probable cause. Indeed, the State concedes in its brief that "there is nothing inherently criminal in possessing a firearm." As the First District recently observed, "under the current legal landscape, police cannot simply assume a person who possesses a firearm outside the home is involved in criminal activity." *People*

*v. Markeese Thomas*, 2019 IL App (1st) 170474, ¶ 40.

¶ 38   However, here Sergeant Colon had far more than the plain view of defendant's firearm to support probable cause. When Colon asked defendant to exit the vehicle, defendant maneuvered his body as though he was trying to conceal something. Defendant would not exit the vehicle. Colon then opened the door, but defendant pulled it shut. Defendant then placed his right hand toward his right pants pocket and Colon directed defendant to stop moving his hands. When defendant eventually stepped out of the vehicle, Colon saw a firearm in defendant right front pants pocket.

¶ 39   We note that Colon properly ordered defendant to exit the vehicle. Ordering a passenger out of a vehicle during a traffic stop is a permissible safety measure that requires no independent justification. *Maryland v. Wilson*, 519 U.S. 408 (1997). Further, we determine that the evidence was sufficient to provide Colon with a reasonable suspicion that defendant was not in lawful possession of the firearm warranting the seizure of the firearm and pat down. See *People v. Hood*, 2019 IL App (1st) 162194, ¶ 71 ("Police officers are not required to completely eliminate any legal explanation for a defendant's suspected possession of a firearm and establish the defendant was committing a weapons offense prior to investigating further during a *Terry* stop.")

¶ 40   We also determine that considering the totality of the circumstances, the troopers had probable cause to arrest defendant following recovery of the firearm on his person. A reasonable officer, viewing defendant's conduct as a whole, in its full context, and drawing common-sense inferences would be entitled to this thought: defendant acted as if he knew he was prohibited from having a firearm and took steps to hide it, defendant told inconsistent travel stories, and would not exit the vehicle when asked.

¶ 41   We are mindful that, given *Aguilar* and the licensing acts, "police cannot simply assume a person who possesses a firearm outside the home is involved in criminal activity. See *People v.*

*Thomas*, 2019 IL App (1st) 170474, ¶ 40. However, the totality of the circumstances here indicates more than mere gun possession. Taken together, defendant's actions would lead a reasonably cautious person to believe he was committing or had committed a crime, thereby establishing probable cause to arrest him.

¶ 42    Because the evidence shows the troopers had probable cause to arrest defendant under the totality of the circumstances, any argument regarding *Aguilar* included in the motion to quash arrest and suppress evidence would have been futile. See *People v. Grant*, 2013 IL 112734, ¶ 23. Therefore, defendant did not suffer prejudice from his trial counsel's failure to raise the issue in the motion to quash arrest and suppress evidence, and we determine that defense counsel was not ineffective.

¶ 43                                         C. Sentencing

¶ 44    Defendant argues that the circuit court abused its discretion by sentencing him to an excessive nine years' imprisonment for his conviction of unlawful possession of a controlled substance (720 ILCS 570/402(a)(2)(A) (West 2018)), given his good behavior during pre-trial release, lack of criminal background, strong family ties and work ethic, and rehabilitative potential.

¶ 45    It is well established that the trial court's sentencing decision is entitled to great deference. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). This is so because "the trial judge, having observed the defendant and the proceedings, is in a much better position to consider factors such as the defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36. Absent an abuse of discretion by the trial court, a sentence may not be altered on review. *Stacey*, 193 Ill. 2d at 210. A sentence that is within statutory limits will be deemed excessive and an abuse of discretion where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense. *Id.*

¶ 46    A sentence is excessive where it is within the statutory range but without regard for a

particular defendant's rehabilitative potential. *People v. McKinley*, 2020 IL App (1st) 191907, ¶ 71. "[I]t is presumed that the trial court properly considered all mitigating factors and rehabilitative potential before it, and the burden is on defendant to affirmatively show the contrary." *People v. Johnson*, 2020 IL App (1st) 162332, ¶ 96. We do not substitute our judgment for that of the trial court simply because we would have balanced the appropriate sentencing factors differently *People v. Alexander*, 239 Ill. 2d 205, 213 (2010).

¶ 47 In arriving at an appropriate sentence, the court may consider that a defendant possessed a quantity of drugs that exceeded the minimum for that sentencing range. *People v. Palmer-Smith*, 2015 IL App (4th) 130451, ¶ 29; *People v. Moffitt*, 138 Ill. App. 3d 106, 115 (1985). We note that the trial court found that defendant possessed 28 grams of cocaine, nearly twice the minimum amount required for the offense. See 720 ILCS 570/402(a)(2)(A) (West 2018) (possession of 15 grams or more but less than 100 grams of cocaine). This is a class 1 felony subject to a sentencing range of 4 to 15 years of imprisonment. 730 ILCS 5/5-4.5-30(a) (West 2018). Here, the court imposed a nine-year sentence, which is within the statutory range and therefore presumed proper. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 1.

¶ 48 Nevertheless, defendant argues the nine-year sentence was not reflective of relevant mitigating considerations, including his rehabilitative potential, good behavior while out on pre-trial release, consistent employment, strong work ethic, good character references, lack of prior criminal conduct, and dedicated parenting to his two young children. Defendant further notes that his conduct did not cause serious physical harm to another, and that his criminal conduct was induced by his brother Miguel.

¶ 49 Despite defendant's contentions to the contrary, we determine that the sentence imposed was in keeping with the spirit and purpose of the law and find nothing in the record on appeal to rebut the presumption that the trial court properly considered all relevant mitigating and

aggravating factors presented.

¶ 50    The court's pronouncement shows it relied on the seriousness of the offense, stating that defendant was "someone who is willing to accompany his brother to a drug deal many hours away from home during that time and have a loaded gun with one in the chamber." The record also shows the trial court heard defense counsel's arguments in mitigation and considered the mitigating evidence, noting the character references submitted on defendant's behalf, his good behavior, the testimony that defendant was a good parent, and that his absence would affect his children. Where, as here, mitigating evidence is presented to the trial court, we presume, absent some indication to the contrary, other than the sentence itself, that the court considered it. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. There is no such indication here, and, in fact, the court specifically indicated it considered the mitigating evidence.

¶ 51    Defendant merely disagrees with the weight the trial court accorded to the relevant sentencing factors and asks this court to substitute our judgment for that of the trial court. This we cannot do. *Stacey*, 193 Ill. 2d 209. Moreover, the existence of mitigating evidence did not require the trial court to impose the statutory minimum sentence. *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123.

¶ 52    Next, defendant raises a disparate sentencing argument. An improper disparate sentence may occur either when 1) similarly situated defendants receive disparate sentences or 2) dissimilarly situated defendants receive the same sentence. *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 109. Here, defendant claims the second situation occurred; that he is not similarly situated to Miguel and, therefore, should not have received the same sentence as Miguel for their convictions of possession of cocaine. Defendant bears the burden to demonstrate that he and his codefendant were not similarly situated regarding background, prior criminal history, and potential for rehabilitation. See *id.*

¶ 53    Defendant contends that his sentence should be reduced because he was less culpable than his brother, Miguel, who was also sentenced to nine years' imprisonment for the same offense.[2] Defendant notes that Miguel was the instigator, Miguel told the police that the cocaine was his, and Miguel had a criminal history.

¶ 54    *People v. Stambor*, 33 Ill. App. 3d 324 (1975), is instructive. In *Stambor*, the defendant and the codefendant were convicted of burglary, and the trial court imposed identical sentences of not less than two nor more than six years of imprisonment. *Id.* at 325. The defendant argued that the trial court abused its discretion by imposing identical sentences, because, in his view, he had greater rehabilitative potential than the codefendant. *Id.* The appellate court disagreed. *Id.* at 326. It acknowledged that identical sentences could be inappropriate when rehabilitative potential varied "widely," but such was not the case before it. *Id.* The defendant was 23 and the codefendant was 26. *Id.* The defendant had graduated high school and maintained employment, whereas the codefendant completed only two years of high school and was not employed due to an injury. *Id.* The defendant's criminal history consisted of one conviction for deceptive practices and "some other problems with the law," including a bond forfeiture. *Id.* The codefendant's criminal history consisted of one conviction for aggravated battery and three property offenses. *Id.* The appellate court explained that, while the codefendant's criminal history was indeed greater, it was not greater to such a degree as would render the trial court's decision to issue identical sentences unfair or an abuse of discretion. *Id.* at 327. Moreover, the appellate court continued, the trial court was free to afford greater weight to the nature and circumstances of the crime. *Id.* at 326-27. And, in that

---

[2] We take judicial notice of the record on appeal of *People v. Miguel Ruiz*, No. 2-20-0695. See *In re McDonald*, 144 Ill. App. 3d 1082, 1084-86 (1986) (a court may take judicial notice of matters of record of other cases in the same court).

regard, as the defendant was "at least an equal participant" in the burglary, the trial court was justified in imposing identical sentences. *Id.* at 326.

¶ 55    Here, defendant was 35 years of age. His brother Miguel was 32. Both defendant and Miguel had completed only one year of high school. Both defendant and Miguel were employed. Also, defendant had a prior misdemeanor disorderly conduct conviction, while Miguel had two prior felony drug convictions (possession of cocaine and possession of "THC") and two prior misdemeanor convictions (possession of "THC" and battery). Therefore, apart from their criminal pasts, the histories and characters of the two brothers were similar. Although the trial court stated that if it had to choose, it believed defendant was "more likely to be restored to usefulness," the court may also have concluded that the rehabilitative potential of defendant, as shown by the record, was not so significantly different from that of his younger brother as to move the court to impose a lesser sentence than it imposed as to Miguel.

¶ 56    Further, the record shows that defendant was "at least an equal participant" in the possession of cocaine offense. Defendant contends that Miguel told the police that the cocaine was Miguel's. Assuming this was true, defendant agreed to carry the cocaine on his person. Defendant also argues that Miguel was the leader. However, the record supports the trial court's determination that defendant decided to participate in a drug deal, travelling for three days, and that defendant unlawfully brought along a loaded firearm. Therefore, the nature and circumstances of the crime apparently suggested to the trial court that defendant should receive at least as severe a sentence as his brother Miguel. For these reasons, we hold that the trial court did not abuse its discretion in sentencing defendant on the possession of cocaine conviction.

¶ 57                                III. CONCLUSION

¶ 58    The judgment of the circuit court of Boone County is affirmed.

¶ 59    Affirmed.